May I please the court? Evangelo Arbonides on behalf of Juvenile, and I'm from the District of Montana. I'm an assistant federal defender. Speak up, Bill. Yes, sir. That microphone simply takes for the transcript. It doesn't amplify. Thank you. Okay. Your Honors, in this case, there are two issues. One is the legality of the sentence, a 46-month sentence given to Juvenile after a revocation or probation violation procedure. And the second concerns the divergent goals between the Sentencing Reform Act and the Juvenile Delinquency Act. And I'm going to first talk about the legality of the sentence within the context of the District Court's failure to even mention Chapter 7 policy guidelines. And as the government in its own 27 policy. Policy. Not guidelines. Policy. All right. And as the government, and I'm gracious of this, in its own brief on page 15, mentions, this Court has held that it is abuse of discretion, but has not yet conclusively held that it is plain error. I would submit that the 5th and the 10th Districts have said that it is not plain error, but this case is very special because it's a juvenile case. And because it's a juvenile case, we believe that it is a juvenile case. That it does constitute plain error when one fails to consider or even mention the Policy 7. Does it make any difference in your argument, in your view, where he's sentenced? In other words, if he's sentenced low, would there have been more merit to your argument? Sentenced low as far as low end of the guideline? Yes. I think that if he was sentenced, you know, we were asking the Court for some detention. And we were asking the Court for perhaps a three- to nine-month, probably a top-end nine-month range of detention. Because this child needed some rehabilitation in Rio, needed to get his act straight, if you will. But I don't think it would further my argument if he, for instance, got 37 months. I think it would actually probably hurt my argument because then the Court, the government could argue that the District Court did perhaps consider mitigating factors, which is in the confines of the 3553A factors. But the other issue, too, is that if one looks at the adult revocation statute, 3583, it excises, it does not have a very important factor, which is discussed in McBell, and that is punishment. Just punishment, let's see, besides just punishment, there's other issues that, and it's 3553A2, uppercase A. It talks about respect for the law and just punishment. And if you look at the Court's words during this hearing, you know, the Court, I think, tried to do its best. Okay? I will submit to that. It tried to do its best to find some middle road for this young kid, for this juvenile. It said, you know, we're going to put you in the Rio facility for the purpose of to get your education and maybe get your head straight. But the problem is, is the language he used went toward kind of punishment of and lack of respect for the law. It talked about. Probably was considering the offense a little bit, do you think? Yes. Yes. And that's. Well, I think under McBell, it takes into account those factors that McBell says one shouldn't take into, even with adult revocation proceedings. In other words, it's one thing to talk about breach of trust. Another thing to use those violations as kind of punishment for an underlying reason to revoke. Which, unfortunately, this Court did. And I would submit that the best thing this Court can do is to send it back to the district court and with the instruction to consider those policy guidelines. And. What wasn't considered? I mean, we understand there's not a reference to it. What was left out in your calculation? Well, what was left out was the factors that I think encompass or, if you will, take, offer substance to provide real substance and foundation to the Juvenile Delinquency Act. You know, things like rehabilitation. Perhaps, for example, you know, a little kick in the butt would be good for this kid. But not 46 months, because what happens is, guess what? After 46 months, there's no more supervision. So, if we give him maybe nine, ten months, and then give him another two years supervision. Because, you know, here's a kid who did really well at the Swan Valley Boot Camp. Great place. Not necessarily really well, because it wasn't long after that that he started transgressing. Within a week after getting out? It was a week after. But within the context of Swan, he did well. But, unfortunately, once he got back in the community, you know, they did try to place him in a good home. I would argue for a long-term detention sentence. Well, again, I think, you know, I will concede that it wasn't a good fact for my client. But if you consider the thrust of the Juvenile Delinquency Act, give him another chance. You know, he didn't get any detention. So, here's a kid who's going to get, for the first time, ten months' detention, perhaps, or nine months, or 18 months. Then put him back out in the community, see what he does. I don't know. If the court has any other questions, I'd be happy to answer them. Otherwise, I'd like to reserve the remaining amount of time. Thank you very much. Good morning, Your Honors. My name is Lori Sook, and I'm an Assistant United States Attorney from the District of Montana. In this case, what we have is a technical glitch by the district court. There's no doubt that he failed to reference the Chapter 7 policy guidelines. But what difference would that have made in this case, where the court clearly put his intent on the record, that rehabilitation was necessary, treatment was necessary, and the only way that that could be accomplished was in a structured environment? Let me ask you a question. You say it's a technical glitch that the judge didn't mention the advisory policy, Chapter 7. Absolutely. How do you explain this statement at ER 23? This is the prosecutor's statement. A juvenile sentence is appropriate in this case, a sentence within the advisory guideline range. Isn't that evidence that the prosecutor called the advisory policy to the judge's attention, wanted an advisory guideline range, and the judge completely disregarded that? Your Honor, I interpreted that statement by the prosecutor who was at the hearing as advocating a sentence, which is exactly what she said, which was in the advisory guideline range. Oh, you're saying the sentencing guidelines. Absolutely. And then taking a Booker attitude and calling them advisory rather than advisory policy under Chapter 7. Absolutely. The problem with this misuse of language, calling these policy statements guidelines and vice versa, it sometimes isn't a problem, but in this case, a plein air argument has been raised that makes it quite clear that it can be a problem. The Chapter 7 policy statements are just that, policy statements. And the guideline and the plain language of this statute uses the word guideline in 5037C1 and 2. That is the meaning. Let's take that to be true. Yes. He said within the advisory guideline range. Right. The out portion of the range was 46 months, wasn't it? Yes. This wasn't within the range. It was the whole range. It was the range. It was not a sentence outside, but it was a sentence at the very high end of the range. And certainly the prosecutor, the United States, can advocate for a sentence somewhat less. It is, of course, the decision of the district court as to what is best to do for this juvenile. The policy behind the Juvenile Delinquency Act is clear. It is rehabilitation, but it's a fallacy to think that the district court, in looking at a juvenile like this juvenile here, wouldn't consider not only the nature of the offenses, but the nature of the violations. They guide the district court as to what the needs of the juvenile are. And in this case, it was a serious underlying offense, and the violations for what they told the court, they told him this. This juvenile cannot comply with conditions outside of a structured environment. Not all the juvenile's fault. There was no supervisory person in this juvenile's life at all. The district court knew that. That was of record. These violations showed a substance abuse problem, a serious lack of respect for authority. So Judge Haddon was faced with a 14-year-old juvenile, and in his mind, a chance to rehabilitate before this juvenile gets any older and becomes adult, and then faces those drastic consequences. And in his view, a structured environment for a long time was necessary. This juvenile wasn't getting any education. At 14 years old, he was looking to get him his high school diploma as well as treatment. And so when we look at this case, although the judge did focus on 3553A to an extent, and you may think even to too much of an extent, because clearly the Juvenile Delinquency Act requires rehabilitation, his statements walk hand in hand with his desire to rehabilitate this juvenile in the only way that he saw fit. I realize we're not a sentencing court. We don't do it in the first instance. Absolutely. The one piece that I really wondered about was the lack of a transition stage. He's sentenced to 46 months, very much supervised. Then he's in custody. And then it's wide open. One of the things the defense suggested was at least there should be some consideration of a transition. Obviously the defense would seek much less than 46 months. But the lack of a transition did make me wonder if there's something the district court might rethink upon being told to specifically reference the policy statements. That's the one piece I wondered about. What's the government's reaction? You know, I agree. I really have to tell you I agree. I think Judge Bea has pointed out that the prosecutor didn't ask for the high end of that advisory guideline. And although I wasn't that prosecutor, I would suggest probably for that reason, that when you have a juvenile of this age, you want some transition period. But what we're here, as you also said, to do is not to redo it again. It's not wrong if we would have just done it differently than the district court. He has to have errored, and some legal error that would make a difference. I found that. On some level, we know that there's a potentially technical error with regard to not. So I think as I view the case, I'm looking, well, what difference does that really make here? And I think that's the question you posed at the outset. Yes. And frankly, I'm in many ways sympathetic with your argument because it seems to me Judge Haddon's intent was not necessarily inconsistent with the policy statements. And then I hit this one element, which does give me some serious pause. I understand, and he didn't reference the Chapter 7 policy statements. And Judge Ferris asked a question to Mr. Arvanites that I found interesting. Would it have made a difference, I think your question was, if he had gotten a lower sentence than what the judge imposed? Was that your question? I think that gets to the heart of what we're talking about here. The question for us, I think, is what difference would it make? If it makes a difference, we ought to send it back. If it doesn't, then there's a question about it, maybe. And that's what I wanted to know.  He was. So what difference would it have made if he had read oil policy? You can send it more leniently. And I think it was, the question is right on point. In the view of what I read from this transcript from Judge Haddon, it wouldn't have made a difference. If it was something lower than what it was, maybe. But I think Judge Haddon's view was entirely clear as to what he wanted done here, a structured environment for the longest time possible, because he didn't see any other way. And whether I or the court agrees with that concept in a transition period is exactly why this statute was amended a few years ago. When I first started in this business in the mid-'90s, we didn't have this option of juvenile supervision after detention, which was clearly just a train wreck with most of these juveniles. I saw them immediately after they became adults, and they were offending as adults, and there was no transition. And that transition period is valuable. In this case, Judge Haddon's view was, because of the lack of any structure in this juvenile's life, I don't think he was going to be able to do it. And the fact that he had been given a break before. A huge break, right before the argument. I asked Mr. Arvanites how he was so lucky to have the feet of Judge Haddon actually giving him five years' probation at the outset. I know you review a lot of sentences of Judge Haddon. That's an anomaly in itself. He usually doesn't take the chance on anyone, because he sees it as this is a chance to give the juvenile the tools they need before the drastic consequences of becoming an adult. And that's usually his mindset. And I don't believe it will make any difference in Judge Haddon's mind with the record that he has. If there are no other questions. Thank you. Thank you. Rebuttal. We did do a fine job at sentencing, and the judge did really do his best. And it was an anomaly to get probation for this kid. But I think it was because there was a 14-year-old kid who was playing with matches and unfortunately sat with two girls who weren't charged and set the apartment building on fire. You know what happens, and you know it, too. They didn't notify anybody. They knew there was a fire, and what did they think was going to happen? They're 14-year-olds. If they don't notify anybody. You see? They were young kids. The judge had to look at that. But the reason why the guideline was so high, let's face it, was because of the money. So here we are. We're going to put this kid in custody, you know, contrary to the act, juvenile act, simply because it was $265,000 worth of damage. I don't know that that ends the course. As we look at this record, what I see, and you can tell me if I'm wrong, here was a child who was out of control, completely out of control, who had a break, who we tried leniency. It didn't work. So now we're going to keep him in a structured situation. That's what it looks like. And you're saying, if the judge had just known there's this policy which says he can be more lenient, he would have been, and I don't know what this record says. But these are Class C violations. I mean, here's a 15-, 16-year-old kid who tells off the principal, who goes out and smokes some pot, who runs away. Giving away from a treatment center with two underage females is probably the low spot. In the face of this, it's a kid that needs more help. And you went out yourself and said he needs more help. Of course, of course. And I think the question's really on the table. If it would be sent back, is there any realistic possibility that Judge Haddon is going to come out with a different point of view? I think it is. I think it is possible, because even though the Swan Valley Boot Camp, one, is not an option because he's already done it, two, because it's not in business anymore, there are other things like private schools, Native American boarding schools, that I've gotten a lot of kids in, unfortunately, on the first leg of this journey, not on the back end. But let's try it on the back end. Let's at least give it a shot. You know, let's talk to the probation department, work with them a little more. I certainly would do that and work with them. We might do that, and who knows, we might do that. But is there any real possibility the district court's going to do that? Your Honor, I think, you know, Judge Haddon, he does care about these kids a lot. He does, he really does. And I know that the, you know, United States v. Juvenile case from a few years back, you know, perhaps is something that we all know about and it shines a negative light, but he does. I see him every day in court. I think he does care, and I think this case reflects it. What I really wonder at this point now is having the sense of, look, we gave you a chance once, and you not only fumbled it, you kicked it out of the park. You know, in the old days, and I don't know how much time I have because the clock. Time seems frozen sometimes, doesn't it? We used to have a system in the state of Kansas where you'd send people to prison for 90 or 120 days, and it's called shock treatment, and then bring them back, and it was pretty effective. This, I tell you, this would be a great shock treatment. He thinks he's looking at 46 months right now. We bring them back. We work with the probation office. The probation office does a great job talking to the judges. The judge listens to them, and who knows, you know, good things can happen. I think we should give it a shot. Thank you, Your Honor. Thank you very much. The case just argued is submitted. The next case on the calendar is the United States v. Stone.
judges: Farris, Clifton, Bea